That would, each side has 15 minutes. Good morning. Good morning. May it please the court. My name is David Garfinkel. I'm here with A. N. O. Sherman. We are pro bono counsel for the defendant, for the appellant Istvan Kopacz. Will you be using all the time? Yes, we'll be, I'm going to set aside three minutes for rebuttal. Thank you. Okay, thank you. This case is about shortcuts. In the government's trial of Mr. Kopacz, the government took shortcuts. These shortcuts undermined both the fairness of his trial, as well as the substance of the convictions. This happened in a few ways. One way it happened was with regards to identity. First, the government reneged on a pretrial agreement regarding the display of Mr. Kopacz's identity. And to compound the prejudice, after reneging on that agreement, the prosecutor made an improper statement, akin to vouching, regarding the individual in an at-issue ATM surveillance photo, implying to the jury that the individual in that photo was indeed Mr. Kopacz, when that fact was not in evidence. A couple of other ways that Well, what would have been, but the video would be in evidence, and your client was in court. My understanding was that it was anticipated he didn't need to show his tattoos, but it wasn't, didn't, did something happen that they decided that they needed to? So it, so what happens, so if, kind of going back, in the, there's a pretrial oral agreement on the record. It's at volume three, excerpt of the record, page 508, where there was, the government wanted to come to a stipulation to a display of tattoos to assist the jury in making comparison. They wanted to compare the ATM surveillance photos with some form of display of his tattoos. And they wanted to do this in one of two ways. One way was to have him make this in-person display, which is ultimately what happened. But Mr. Kopacz's counsel and Mr. Kopacz's counsel decided against that. What they agreed to was, a couple of years ago, Alameda County Sheriff's Deputy, Maurice Witt, took a series of photos of Mr. Kopacz while he was in cell. He was shirtless in these photos, displaying his tattoos. They actually had Alameda County Jail shorts on. So the government had, if you look at actually the pretrial witness list, in three, in volume three, excerpt of the record, page 517, the government had Maurice Witt ready to authenticate these prison photos as a form of comparison to compare against the ATM photos. So it was either that or have the in-person display. Mr. Kopacz's counsel agreed to do the, for those photos to come in, those prison photos, so they can do that comparison. A couple of, sorry, go ahead. Now at trial, this, so that was all the agreement was kind of centered around. At trial, during the government's, they called witness Agent Lopez, the Secret Service witness. When they called the Secret Service witness, they attempted to have her testify to the individual in the ATM photos, effectively acting as almost a juror in that sense, because she did not know Mr. Kopacz. She didn't know who the individual was in the ATM photos. She was, effectively would be giving this almost expert testimony as to who that individual was when it was a role for the jurors. So But ultimately, I guess I'm, I'm, I'm seeing, you know, you're making all of these arguments, but the jury gets to see the, the video or the, the photo there, and it shows someone with tattoos. And your client is in court, they show the tattoos, and it's, the jury's looking, they can look at, do those tattoos match the person in the video? So I'm, I'm having a hard time seeing how, the likelihood of what, what the problem is here. Yes, Your Honor. So to, to kind of clarify, the purpose of the, there's, so there's these prison photos, and then there's these ATM photos. The prison photos, defense counsel But you really want them to know he's in prison? So that was, that's part of the prejudice here. He, he agreed to these photos of him in prison to act, as opposed to having to, to make, to stand up and make this somewhat There has to be a linkage to the person in court, right? You've got some photos, stipulation that the photos come in. Now you've got the defendant in court, the tattoos that defendant has on him in court then provides the link. You're saying that the government violated a stipulation not to do that sort of physical demonstration in lieu of the photos coming in and the linkage to the defendant being made only on the photographic evidence. Is that the argument? So the, the linkage there, the linkage was Because, because the reason I ask that is I'm looking at the record, and it isn't clear to me what the scope of the government's concession was when they reached the stipulation for the photos to come in. I thought that the government was just saying, well, okay, the defense is essentially not forcing the government to lay the a matter of asking two or three foundational questions, but that there wasn't any promise not to do that sort of physical demonstration in court. And there's nothing wrong with doing the physical demonstration. The law permits that. So what exactly is the problem? What was the stipulation that the government violated? So I agree the law doesn't, doesn't prevent the government from having that display. However, what that agreement was, so the, the linkage there that you mentioned, the linkage is part of the stipulation for those, those prison photos to come in was the stipulation was that these are authentic photos and that these are, are of the defendant, Mr. Kopatch. That was, that stipulation was saved to the jury. So the, the, like the jury, so the prison photos, like this is Mr. Kopatch, that was supposed to be used, and in fact, the government actually did use this in their closing. They used those photos to compare it to the ATM photos. And if you look at the, if you look at the oral agreement, like three except for the record, 508, that the purpose was, and defense counsel says it's like that, that's all there, there should be. I understand if it, it may come across a little bit vague. Yeah, maybe there was a failure of meeting of the minds between what you thought the government had promised and what they actually promised. But we'll, we'll see what the AUSA says about that. If there had not been an agreement, what, why wouldn't they have been admitted by the district judge? What, what's the basis that they would, that these photographs would have been excluded? The basis of, of the prison photographs? Correct. I mean, the prison photographs, I, they, in, in their own right are prejudicial. That they, they show this, like, a man, he's in, if you, it's in the supplemental excerpt for the record, page 19. These are some of the photos that came in. They show him, it's almost akin to someone kind of like, in like a jumpsuit. It's, he's got these Alameda County jail shorts on, he's shirtless, he's got tattoos. My second question is this. When, when the agreement, what you're calling the agreement was set forth, it was before the judge, it was on the record before Judge Breyer, correct? Yes. And subsequently, when Judge Breyer excluded testimony by Agent Lopez, where she was going to compare the photographs and the tattoos, he, sua sponte, said this may raise the issue about whether the tattoos can be shown. You agree with that? Yes, I agree. That's what the record says. So in terms of the discretionary function of a, of the, of Judge Breyer in determining what evidence would be admitted, why wouldn't his decision to exclude Agent Lopez's testimony, which wasn't discussed at the time of the original agreement, matter in terms of whether there was an agreement? And also why wouldn't it be appropriate for the person who heard the, the discussion about the agreement make a determination that it didn't preclude showing the tattoos under this changed circumstance? Yes, Your Honor. My understanding is there's a lot going on at the trial at the time. And simply, respectfully, Judge Breyer erred in that situation in that there was any changed circumstances. There, as you noted, Agent Lopez's testimony wasn't even considered in that pretrial agreement. It was rightfully excluded at that time because they were, the government was attempting to have Agent Lopez effectively act as the juror. And I believe the, the Judge Breyer said it at that time, like there's no reason that 12 other people, as in the jury, couldn't kind of come to that same determination. So like, I think U.S. v. Shapiro is actually quite Well, I, I'm not seeing, you're spending a lot of time on this, and I'm not seeing it get great traction. But that's only my view. But then the prosecutor said something that you said was vouching, something that the defendant applied, that's, that the, the prosecutor was identifying the defendant as opposed to leaving that to the jury province. Yes, Your Honor. So in 4 excerpt of the record, page, 3 excerpt of the record, page 429, as Mr. Kovach, after they've gone back on some agreement, he's rolling up his sleeves, making a display for the jury, the ATM photos, the at-issue photos are being displayed behind him. And the individual in the photos is So he uses the word loosely, that's the defendant. But I guess, I, I don't really see what the damage is that I think most jurors would assume, that it doesn't mean that you agree with everything the prosecutor says, but the prosecutor would prosecute the person that they thought was guilty. So, I mean, you're just using nomenclature there. I think some of your other arguments might have more traction. Why don't you move to those, since I think you wanted to save 3 minutes for rebuttals. So we're already down to 5. Yes, Your Honor. So in addition to the, what we're discussing regarding the agreements, another shortcut that the government took was with regard to the approving of the interstate commerce nexus. The government attempted to approve interstate commerce through one witness. It was Brian Jang, who was the VP of corporate security at First Republic Bank. He was not a custodial witness, he was an investigative witness. His, and, and his testimony to, it was only kind of one piece of testimony to establish this interstate nexus, was that the ATM transactions were, went, went to these out-of-state servers in New Jersey. And Texas, potentially. And Texas, potentially. That's correct, Your Honor. The problem with that testimony was that on cross-examination, so these servers, he, he said that these servers were held by a third-party company, which was Fiserv. On cross-examination, he, he specifically admitted to having no, no personal knowledge of where those servers were located. His knowledge was in- Well, he knew enough to know that they were out-of-state, though, right? He, he, he was entirely, he was, he, while he said he knew, well, on a direct, he said he knew enough. On cross, it came out that his knowledge was entirely from this kind of second-hand speculation of where Fiserv held, had their servers, where he never, never actually, like, operated these servers. He never looked at Fiserv's- Well, it seems to me that your argument goes to the weight of what he said. He, well, you're saying sufficiency of the evidence. You're saying that, that there was no evidence of one of the elements of the crime. But he testified and gave testimony that it was, that for that, you cross-examined him, and it was up to the jury to decide if that element was established. So how do you win on that? So we, that, that cross-examination testimony, I agree, it got, it, it was submitted to the jury on that. For, at the one, at one part is we don't, this shouldn't have been submitted to the jury because based off of that cross-examination admission that he didn't have any personal knowledge. So did you ask to strike all of that testimony? There was, there was no objection made at the, at the time in the record. I, I can't speak to what, what trial counsels, I'm thinking what they're. Well, so then that puts you at what error? Plain error? No, your. Well, it's an element of the crime, but there's evidence in there that you don't object to. So then it's up to the jury to weigh whether that established that, that element. You say it doesn't, they say it did, and the jury obviously was instructed as to the elements of the crime. So if there weren't, if there, without that witness, I would, I, you have my attention that there would have been, there would not have been evidence of that, but that wouldn't, that testimony went to the jury. That testimony did go to the jury. The jury instructions also state that they shouldn't have to speculate regarding beyond the reasonable doubt standard, which is what needed to be met there. And I only have a couple of minutes, and I would like to save some time. Just one last question. I'll give you a little bit of time. One of the exhibits that was admitted was the transactional history, and that showed East Coast timestamps. Why was, in terms of the weight of the evidence, wouldn't that be part of the evidence to be considered in terms of whether there was a communication with servers outside of the State on the East Coast? Yes, Your Honor. So those timestamps, those were in, first, the public bank's business records, and there was no, even on Mr. Jiang testifying to those Eastern timestamps, it's still entirely speculative of what is driving that. Those weren't necessarily authenticated timestamps. They could have, there's a whole list of reasons why something might be in Eastern. Was there objections to that? I don't believe so, Your Honor. Okay. And then just one last point. I'm going to save the rest of my time for rebuttal. There was a Rule 29 motion filed, so rather than plain error, I recommend the Court add an abuse of discretion standard in denying that Rule 29 motion. And for now, I'm going to save my remaining time for rebuttal. Okay. I'll give you two minutes for rebuttal. Thank you. All right. Thank you, Your Honor. Thank you, Mr. Garfinkel. Good morning. Good morning, Your Honors. And may it please the Court, Molly Smolin for the United States. This Court should affirm the district court because none of Kopach's contentions have merit. I'd like to begin by addressing why the evidence here was more than sufficient for a rational jury to conclude that Kopach's crimes necessarily impacted interstate commerce. And here the standard is that this Court must affirm the denial of a motion for a judgment of acquittal based on sufficiency of the evidence. If after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. And we're familiar with the standard, counsel. Let me ask you something. You weren't the trial lawyer in this case, right? Correct. So with regard to the issue of the comment, this is a picture of defendant, or this displays the defendant's face, I think was the comment. That was clear, clearly erroneous, right? No, Your Honors. Whether it survives plain error review is another question. I didn't see an objection in the record. But you can't point to a photograph and say, well, this is the defendant. Now, you have other arguments. It may not matter in this case in light of the clarity of the photo, plain error view, et cetera, et cetera. But I didn't see an acknowledgment in the government's brief that you can't do that. Well, Your Honor, at most, this was a misstatement by the prosecutor at trial. Well, except you sit there. I was a prosecutor. You can't sit there and go, oh, there's the defendant. Look at those tattoos. You know, you can't do that. There's a lot of blurry photographs being shown, and that's the prosecution's burden, is to demonstrate the link to the defendant sitting in court. So you can't point to a photograph.  face. Now, it didn't draw an objection, and it should have. But I would have thought that in that instance there would be some acknowledgment in the brief that that statement was not appropriate, whether it was inadvertent or something like that. I'm not commenting on that at all. But I was a little bit surprised to see no concession there. Well, Your Honor, at most, this was a misstatement. So while arguably one could find that it was error, there are no cases supporting that this would be plain error, that it's a clear and obvious error. Because, for example, in United States v. Young, which was a plain error case, yes, the prosecutor in rebuttal expressly told the jury that in his personal opinion what the defendant did was fraud. And there the Supreme Court held that that was not plain error when taken in the context of the entire trial. And in the Hermanic case, this Court, applying harmless error review, found that where a prosecutor repeatedly referred to the investigation team as we and us during closing, thus expressly vouching for the credibility of the witnesses and making it clear that in the prosecutor's personal belief that the witnesses and the investigation team deserved integrity, that this was the prosecutor's personal belief, it was objected to below, and this Court held that that was harmless error because it was not an intentional statement, and nor were those statements so numerous as to materially affect the fairness of the trial. And similarly here the Justice Sotomayor. Sotomayor, I understand that. My point simply is that whether it was right or not is different than the application of plain error review or a review for harmlessness. Let me ask you another area that I am somewhat troubled by in this case, because we're seeing it a lot, not just in this case, but in a number of other cases as well, where a fact witness also relies on some expertise during the course of his testimony. And I wanted to see what the government's perspective on that is. Because during his testimony, Mr. Zhang did refer to things like velocity, structured transactions. That's not commonly within a layperson's knowledge. So do you see this as a dual testimony situation? No, Your Honor, because the standard for whether something crosses that line from lay opinion testimony into expert testimony is the basis of the opinion, not the subject matter itself. So here, where Mr. Zhang was testifying as a precipient witness, his testimony about the meaning or his opinion on the way that these transactions took place was based solely on his knowledge of this investigation. So it's – and that's made clear because he's actually asked at one point whether he had ever encountered a series of transactions, a pattern like this one, and he said that no, he hadn't, and that's at volume 2, excerpts of record 288. So it's clear that in the context of Mr. Zhang's testimony, that his opinion to – of which Kopach complains here could only have been based on case-specific facts, which this Court approved in Gadsden in a similar context where the agent there testified based on his knowledge of the investigation as to the meaning of a coded drug term. And that was permissible lay opinion testimony. So it was not a dual-purpose witness there, and it was not here either. But returning to the issue of the interstate nexus, which opposing counsel was discussing with this Court, Exhibit 52, that transaction journal in this case, made clear that at the very least the transactions in this case necessarily crossed State lines because, as Mr. Zhang explained, this – this document that he created in the course of his investigation in this case showed that the time that these transactions occurred was recorded in Eastern time, which was the time that the transactions hit those servers in New Jersey. That was sufficient for the jury to conclude that, as they were instructed, that Kopach's conduct in some way affected commerce between one State and another State. That was their instruction. That's at Volume II, Excerpts of Record 101 and 102. And that was enough there. But I would also like to address the issue of the display of Mr. Kopach's tattoos to the jury. And here it was well within the district court's discretion to require Kopach to show those – the jury his tattoos. And the parties did not stipulate that in return for Kopach agreeing that Exhibit 101 was authentic and admissible, that the government would therefore not seek to have Kopach display his tattoos. That's simply not what the stipulation said. All it said was, with respect to Exhibit 101, that the parties agreed that that exhibit consists of photos of Kopach taken on August 17, 2022, which are authentic and admissible. That's at Volume III, Excerpts of Record 488 and 489. Nothing more. That was the scope of the agreement. And nothing that happened thereafter at trial violated that agreement. Are you saying there was no discussion between the counsel as to not necessarily causing Mr. Kopach to display his tattoos? There was, at the pretrial conference, statements made by defense counsel that in his opinion, Exhibit 101 should come in and that's all that should happen. That was defense counsel's opinion, but that's simply not reflected in the stipulation that the parties agreed to, that they entered into the record, and that was read to the jury. Right. I think the confusion for defense counsel, of course, it wasn't the trial lawyer arguing for the defendant today, but Mr. Yeh, was that the AUSA trying the case? Mr. Yeh and Mr. Chang. Right. Said that should be fine, Your Honor, so perhaps that led counsel to think that that was an agreement. If that was the case, Your Honor, and the record of the pretrial conference is subject to multiple interpretations, any confusion there should be alleviated by the stipulation which followed after the pretrial conference. That was the agreement. That was the meeting of the minds that was entered into the record here. But there was also some discussion about whether it's a person or an organization, a specific individual, and if you think 1028A extends to stealing the identity of an organization, how do you harmonize 18 U.S.C. section 1028D7, which provides that the term means, the means of identification in 1028 means a name or number that may be used to identify a specific individual. So how do we, should we be concerned about that? No, Your Honor. In fact, the argument that Kopatch is making here on this point is a very narrow, limited argument because he concedes that the evidence was sufficient for the jury to conclude that Kopatch knew that the debit card and pins that he was using belonged to real account holders. He's trying to make a distinction between real people, real account holders, and natural people. But that distinction is simply not supported by the evidence here. First — Well, couldn't an entity be a real account holder and have persons authorized by the entity to use the ATM card? That is possible, Your Honor, but the means of identification here is not the account number. It's the debit card and pin numbers that Kopatch was using. And the evidence in this case that the jury could reasonably impute to Kopatch was that those means of identification that he was using could only belong to real people. It's not the account. It's the debit card and pin numbers, which, as Mr. Zhang testified, could only be issued to real people and were unique. Well, couldn't a real person be issued a card for an account associated with a business, an entity? Yes, Your Honor, I believe so. But still, the means of identification that Kopatch was using were necessarily belonging to real, natural people, even if there had been evidence in the record that in this case those debit cards were connected to a business account. But that simply wasn't the case here. And the way in which, first of all, the means of identification were obtained only makes sense if it only makes sense that Kopatch would know that these were related to real people. They were obtained by the use of skimming devices and pinhole cameras. Only a real person uses an ATM. Only a means of identification belonging to a natural person could have been captured in the way that they were captured in this case. And in fact, these were cards and pins that belonged to five real people. But there's no evidence that Mr. Kopatch was present at the ATMs when the cards were used. They were skimmed, correct? That's correct, Your Honor. That was not before the jury. I wanted to clarify something that with Zhang's testimony, you didn't identify Zhang as an expert, correct? But Zhang was identified as a witness. Yes. So that wasn't a surprise. But was there any objection to improper expert testimony of Zhang at the trial? I don't recall, Your Honor. I'm sorry. Well, I didn't see any. I'll ask counsel for Mr. Kopatch. But so the court admitted all of the testimony or just a portion that required his expertise. Did the court admit all of Zhang's testimony? Yes, Your Honor. Okay. And on all of those points, with respect to the interstate nexus, with respect to whether these were real people, the evidence was more than sufficient for the jury to find that all of those elements had been met. Okay. Thank you, Your Honor. We ask that this court affirm. Thank you. Any further questions of our panel? No, thanks. No. Thank you, Ms. Mullen. All right. Two minutes for rebuttal. So can you clarify for me what piece of Zhang's testimony did you object to as being improper expert testimony? Yes, Your Honor. I was trying to track down that pin site. Okay. The specific testimony that was objected to, I believe, is on the record at two excerpts of the record, 286 through 288. There were objections to questions that elicited testimony relating to the pattern of structured transactions that were almost signature to one person. And I believe those objections were — I don't want to misstate the record. I need to double-check. So do you object to admitting that the court abused its discretion in admitting all of the testimony or just a portion of it that required Zhang's expertise? Our position there is the — anything that was elicited, like, for questions that only an expert could have, someone with this — I think the cases say, like, this air — like, it's this air of expertise. Just didn't Zhang have personal knowledge about how FRB's transactions are sent to all these FISR servers out of state? Didn't he have personal knowledge of that? Of how the transactions were sent? Well, he admitted to not having the actual personal knowledge of how that necessarily worked. He was just — But that he knew that that was the way it happened. His words, I believe, on redirect exam were, like, as someone in this position, you kind of know how things work as far as ATM and transactions go. And that simply should not be sufficient basis for someone to testify to what, like, if there is sufficient evidence for a reasonable juror to find that an essential element of the criminal case has been found. Well, I know you don't like the timestamps, but it seems to me that possibly one could argue that the timestamp showing Eastern Standard Time for the ATM transactions is enough to establish the interstate nexus. I — well, those were — again, those were timestamps within the — within First Republic Bank's own business records, which sort of — it makes it distinct from all the other cases the government has cited, where they — like, everyone was testifying to either their own business records or they were at least looking at this third-party business records. Mr. Jiang admitted to doing none of that, and that on its own should be based — Well, that — but that's one way you could look at it. You were free to cross-examine and show it couldn't mean that, right? And — sorry, can you say that again? Well, if you — the stamps are there. You could cross-examine the witness and show that it couldn't mean that, right? Yes. Or you just don't want to touch it because it is evidence. Admittedly, it is a tricky issue, but that — I think if you look at the fact that these were — he was looking at only First Republic Bank's business records, and these were — he doesn't understand, like, how — where these timestamps came to. Perhaps that could have happened uncrossed, but that insufficient — that him just admitted to not having any personal knowledge about those servers generally, I think should be enough to undermine any inference of that there was — that he had the sufficient basis to testify to the — Well, you're already at — I've given you three and a half minutes, but I've taken up some of that time. So if you want to just wrap up, that would be good. Yes. I mean, so just a couple points. I just want — the government mentioned, like, this stipulation, the written stipulation. I think you can't read that stipulation without looking at the pre-trial witness list from Maurice Witt. But should the parties not agree to stipulations on photographs of Mr. Kopatch being entered into evidence or alternatively allowing Mr. Kopatch to exhibit his identifying tattoos in court to the jury, Deputy Witt will testify. I think that helps better explain that agreement. And then just briefly — I know I'm over time — briefly on the real-person point, the only evidence that they — the evidence that they imputed for the debit cards was this knowledge that Mr. Jiang had that First Republic Bank only issues to real people. And it's hard for me to see the logic of how — I bet every person on the jury had a debit card. Yes, Your Honor. And they're thinking they're a person. I'm sure that they — that doesn't still take away the government's ability to prove that Mr. Kopatch — that Mr. Kopatch himself or the defendant had the requisite knowledge. And that evidence that a bank has shown this like might only do to real people doesn't show anything about what Mr. Kopatch would know. Well, can the jurors use their common sense on that issue? Absolutely. Evaluating the evidence? Absolutely, Your Honor. Yes. All right. Thank you for your argument.
judges: CALLAHAN, NGUYEN, Kronstadt